1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6
7    LENIOUS BRYANT,                    Case No.  15-cv-02982-JSC
8                  Plaintiff,
                                        **ORDER RE: CROSS-MOTIONS FOR**
9         v.                            **SUMMARY JUDGMENT**
10   CAROLYN W. COLVIN,                 Re: Dkt. Nos. 15, 17
                  Defendant.
11
12
13        Plaintiff Lenious Bryant ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),
14   seeking judicial review of a final decision by Defendant Carolyn W. Colvin, the Commissioner of
15   the Social Security Administration ("Defendant" or "Commissioner"), denying his application for
16   disability benefits and insurance benefits under Titles II and XVIII, Part A, of the Social Security
17   Act, 42 U.S.C. §§ 401-403, 1395.  Both parties have consented to the jurisdiction of the
18   undersigned magistrate judge.  (Dkt. Nos. 6, 7.)  Now pending before the Court is Plaintiff's
19   motion for summary judgment and Defendant's cross-motion for summary judgment.  (Dkt. Nos.
20   15, 17.)  After carefully considering the parties' submissions, the Court GRANTS IN PART
21   Plaintiff's motion and DENIES Defendant's cross-motion.
22                              **LEGAL STANDARD**
23        A claimant is considered "disabled" under the Social Security Act if she meets two
24   requirements.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).
25   First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by
26   reason of any medically determinable physical or mental impairment which can be expected to
27   result in death or which has lasted or can be expected to last for a continuous period of not less
28   than 12 months."  42 U.S.C. § 423(d)(1)(A).  Second, the impairment or impairments must be

United States District Court
Northern District of California

severe enough that she is unable to do her previous work and cannot, based on her age, education, and work experience, "engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).  To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining:

> (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work."

*Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL BACKGROUND

In November 2011, Plaintiff filed an application for disability and insurance benefits under Title II and Title XVIII, Part A of the Social Security Act.[1]  (AR 218.)  Plaintiff alleged disability beginning September 5, 2008, caused by lower back injury, high blood pressure, depression, stroke, limited use of the right side of his body, and inability to sit or stand for long periods or walk far distances.  (AR 87, 329.)  The Social Security Administration ("SSA") initially denied his claim on May 22, 2012, and on reconsideration on January 4, 2013.  (AR 125-128, 135-139.)  Plaintiff then filed a request for a hearing before an ALJ.  (AR 140-142.)

On November 12, 2013, Plaintiff and his attorney representative, Nancy McCombs, appeared at the hearing.  (AR 43.)  Lawrence Hughes, a vocational expert ("VE"), appeared telephonically and testified at the hearing.  (AR 43, 46.)  The ALJ issued a written decision denying Plaintiff's application and finding that he was not disabled within the meaning of the Social Security Act and its regulations.  (AR 22-36.)  Plaintiff filed a request for review (AR 17-18), which the Appeals Council denied on April 30, 2015.  (AR 3-5.)  The Appeals Council affirmed its denial after receiving and reviewing additional information from Plaintiff.  (AR 1.)

---

[1] This was Plaintiff's second application for social security benefits.  The Social Security Administration denied Plaintiff's first application in 2010.  (AR 204-207, 120-124.)

Plaintiff subsequently initiated the current action, seeking judicial review of the SSA's disability determination pursuant to 42 U.S.C. § 405(g). (Dkt. No. 1.)

## FACTUAL BACKGROUND

Plaintiff, who was 50 years old when he filed for disability, was a high school graduate and resident of Oakland at the time of his initial application. (*See* AR 218, 387.) Prior to his alleged disability onset date, Plaintiff worked for approximately eight years as a warehouse employee in an appliance store and then an office furniture store and for six years as a truck driver. (AR 279, 310.) In September 2007 Plaintiff sustained a workplace back injury when a more than 800-pound refrigerator fell on him; immediately following the injury his treating physician placed him on light duty. (AR 64-65, 489, 499.) Plaintiff stopped working one year later, in September 2008, when his employer fired him because it no longer had light-duty work. (AR 65, 278.) In addition to low back pain resulting from the workplace injury, Plaintiff suffers from degenerative changes to his spine and alleges that he suffered multiple strokes resulting in weakness on the right side of his body. (*See, e.g.*, AR 125, 469.) Plaintiff also suffers from depression and anxiety. (*See* AR 65, 929.) In his November 2011 application, Plaintiff alleged disability due to back injury, right-sided weakness, high blood pressure, stroke, problems walking, and depression. (AR 125.)

## I.   Medical History and Evaluations

### A.   Medical History

As a result of Plaintiff's medical conditions, he has seen a variety of physicians to help diagnose and treat his symptoms. A discussion of the relevant medical evidence follows.

#### 1.   *Initial Injury and Treatment From 2007 to 2009*

The earliest records in the Administrative Record ("AR") are from the period beginning immediately after Plaintiff's 2007 workplace injury. (*See* AR 498-499.) Plaintiff's chief complaint at that time was low back pain exacerbated by moving and sitting and lessened by lying down. (AR 499.) His treating physician diagnosed him with acute lumbar strain/sprain and muscle spasm. (AR 499; *see also* AR 488-489, 501.) Upon examination, the doctor noted that Plaintiff's posture and gait were abnormal, he had difficulty ambulating normally and restricted range of motion in his knees, and he tested positive on two back-pain tests. (AR 499, 501.) The

United States District Court
Northern District of California

3

doctor prescribed carisoprodol/Soma,[2] Tylenol, and Banalg lotion[3]; gave Plaintiff cold packs, a contour lumbar cushion, and fitted lumbar support; and ordered physical therapy.  (AR 489, 499.) She also placed Plaintiff on modified work status involving a "sit down job" with no stooping, bending, kneeling, or squatting; no lifting, pulling, and pushing no more than ten pounds; wearing a back support; and taking ten-minute breaks as needed.  (AR 489, 499.)

Over the next several months, Plaintiff's medical records reflect worsening conditions on the right side of his body (*see, e.g.*, AR 491-492, 497, 503-504), but otherwise the doctor's findings fluctuated: she sometimes observed that Plaintiff had no back tenderness or spasm and had normal posture, gait, range of motion, but other times she observed these symptoms. (*Compare* AR 484-485, 494, *with* AR 491-492, 504.)  Plaintiff remained on modified work status with restrictions of lifting, pushing, and pulling no more than 25 pounds; using a back support; and taking ten-minute breaks as needed.  (*See, e.g.*, AR 472-475, 478-481.)  His pain medications included Tylenol, Naproxen,[4] Soma, and Banalg lotion.  (AR 474-475, 478-481, 484-458, 494.) Plaintiff also attended physical therapy and saw a chiropractor.  (AR 476-477, 504.)

In January 2008, orthopedic specialist Dr. Arun Mehta began treating Plaintiff.  (AR 470-471, 511-523.)  Dr. Mehta diagnosed Plaintiff with thoracolumbar spinal strain with scoliosis,[5] tenderness in the lower thoracic and lumbar regions, abnormal straight-leg tests on both sides, and restricted range of motion; prescribed pain medication—specifically, Vicodin[6] and Soma—, heat,

---

[2] Carisoprodol is a muscle relaxer used to treat injuries and musculoskeletal pain.  *Carisoprodol*, DRUGS.com, http://www.drugs.com/carisoprodol.html (last visited June 1, 2016).  The Court refers to carisoprodol by its brand name, Soma, which Plaintiff's physicians repeatedly prescribed.

[3] Banalg relieves minor aches and pains in muscles and joints associated with backaches.  *Banalg*, DRUGS.com, http://www.drugs.com/otc/107140/banalg.html (last visited June 1, 2016).

[4] Naproxen is an anti-inflammatory drug used to treat pain or inflammation.  *Naproxen*, DRUGS.com, http://www.drugs.com/naproxen.html (last visited June 1, 2016).

[5] Scoliosis is sideways curvature of the spine.  *See Scoliosis*, MayoClinic, http://www.mayoclinic.org/diseases-conditions/scoliosis/home/ovc-20193685 (last visited June 1, 2016).

[6] Vicodin is a narcotic pain reliever for moderate to severe pain.  *Vicodin*, DRUGS.com, http://www.drugs.com/vicodin.html (last visited June 1, 2016).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  and home exercise; and recommended x-rays.  (AR 514, 518-519.)  Dr. Mehta reported that

2  Plaintiff was improving, albeit slower than expected, and recommended that Plaintiff return to

3  work with restrictions, including limited lifting, pulling, and pushing up to 25 pounds and taking

4  10 minute breaks as needed.  (AR 470-471.)

5     Plaintiff had x-rays of his spine in February 2008.  (AR 510.)  The x-ray showed mild

6  degenerative disc disease[7] at multiple levels of the thoracic spine, and moderate to advanced

7  degenerative changes to the lumbar spine including disk space narrowing and some spur

8  formation.[8]  (AR 507-508, 510.)  In his report, Dr. Mehta noted that Plaintiff's thoracic and

9  lumbosacral spine had improved, but still diagnosed Plaintiff with an acute thoracolumbar strain.

10  (AR 506; *see also* AR 468 (in exam notes, diagnosing Plaintiff with a sprained lumbar and

11  thoracic spine).)  Dr. Mehta recommended that Plaintiff continue with the same work restrictions.

12  (AR 468.)  In March, Dr. Mehta's acute thoracolumbar strain diagnosis remained, but he ruled out

13  lumbar disc disease.  (AR 530.)  He noted that conservative treatment had not been working for

14  Plaintiff and recommended an MRI of Plaintiff's lumbar spine.  (AR 532.)

15     Accordingly, in early May 2008 a radiologist reviewed an MRI of Plaintiff's lumbrosacral

16  spine and evaluated Plaintiff for disc herniation.  (AR 528-529.)  The radiologist concluded that

17  several of Plaintiff's vertebrae were bulging but that there was no evidence of neural impingement

18  or spinal stenosis.[9]  (AR 528.)  His overall impression was of degenerative disc disease.  (AR

19  529.)  Dr. Mehta's next few reports from May and June reflect the radiologist's findings: he

20

21

---

22  [7] In degenerative disc disease, the space between vertebrae gets smaller and the spine becomes less
   stable causing numbness and tingling in limbs and back, neck, buttock, and leg pain exacerbated
23  by movements.  *See Degenerative Disc Disease*, WebMD, http://www.webmd.com/back-
   pain/tc/degenerative-disc-disease-topic-overview?page=2 (last visited June 1, 2016).
24

25  [8] Bone spurs, also known as osteophytes, are small projections of bone that narrow the space
   between vertebrae, pinching the spinal cord or its nerves and causing limb weakness, pain, and
26  decreased range of motion.  *See Bone Spurs*, MayoClinic, http://www.mayoclinic.org/diseases-
   conditions/bone-spurs/basics/symptoms/con-20024478 (last visited June 1, 2016).
27
   [9] Spinal stenosis is a narrowing of the open spaces in the spine, putting pressure on the spinal cord
28  or on the nerves, which causes neural impingement.  http://www.mayoclinic.org/diseases-
   conditions/spinal-stenosis/basics/definition/con-20036105 (last visited June 1, 2016).

diagnosed Plaintiff with acute thoracolumbar strain and degenerative disc disease at three different vertebrae in the lumbar spine.  (AR 524, 541.)  Dr. Mehta continued to recommend the same treatment: pain medication; chiropractic, heat, and exercise treatment.  (AR 524-526, 543.)  Dr. Mehta slightly modified Plaintiff's proposed work restrictions, recommending that Plaintiff limit lifting, pushing, and pulling to only 20 pounds; by the end of 2008 he recommended the same restrictions but noted that Plaintiff was no longer working.  (AR 547, 549-551, 555, 573.)

The diagnoses remained constant through 2009, at which point Dr. Mehta concluded that Plaintiff had "achieved maximum medical improvement" and declared his condition of mild to moderate intermittent pain to be permanent and stationary.  (AR 535, 546, 553, 562, 567, 571, 576, 579, 583, 590.)  Plaintiff's pain then began worsening, expanding beyond his back, radiating down to the leg or buttock and eventually including numbness and tingling.  (*See, e.g.*, AR 553, 562, 571, 579, 583, 590.)   For the next few years, Dr. Mehta repeatedly requested epidural injections,[10] but the worker's compensation coverage provider denied these requests.  (AR 564, 568, 573, 578, 580, 585, 591; *see also* AR 657-658, 666-668, 697-699, 728-733, 770-777.)

### 2.    *2009 Emergency Visit for Right Upper Extremity Weakness*

In late May 2009, Plaintiff visited the Highland Hospital emergency department when, after a night of drinking, his girlfriend noticed that he was slurring his speech, had a blank gaze and right-sided facial droop, and that his right arm appeared weak.  (AR 402-403, 412.)  Plaintiff also reported having a throbbing headache for one week prior.  (AR 404.)  Doctors observed that Plaintiff had normal arm and leg strength, gait, and balance, with no motor or sensory deficits. (AR 427.)  The doctors ultimately diagnosed Plaintiff with right upper extremity weakness due to either transient ischemic attack[11] or Todd's paralysis[12] as well as alcohol abuse and hypertension.

---

[10] Epidural steroid injections treat pain and inflammation from pressure on spinal nerve roots.  *See Epidural Steroid Injections for Lumbar Spinal Stenosis*, WebMD, http://www.webmd.com/back-pain/epidural-steroid-injections-for-lumbar-spinal-stenosis (last visited June 1, 2016).

[11] Transient ischemic attack ("TIA") occurs when blood flow to a part of the brain stops for a brief time.  TIA causes stroke-like symptoms and is a warning sign of a future stroke.  *See Transient Ischemic Attack*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000730.htm (last visited June 1, 2016).

United States District Court
Northern District of California

(AR 402.)  Doctors administered medication to prevent blood clots[13] that could contribute to stroke and directed Plaintiff to follow up with further appointments.  (AR 402, 409.)

> 3. *2010 to 2011 Medical History: Continued Back Problems, Mental Health Treatment, and Miscellaneous Hospital Visits*

Dr. Mehta continued to treat Plaintiff throughout 2010.  By that point, noting Plaintiff's low back pain radiating to the legs along with numbness and tingling extending to the right toes and decreased range of motion, he diagnosed Plaintiff with chronic lumbrosacral strain and degenerative disc disease.  (AR 592, 597, 601, 605.)  Dr. Mehta continued to request lumbar epidural injections to no avail.  (AR 594, 599, 602, 607.)  By May 2010, Dr. Mehta noted that Plaintiff's pain was "severe and not contained by any conservative treatment" and recommended that Plaintiff use a cane when needed.  (AR 602.)  Throughout 2010, Dr. Mehta repeatedly indicated that Plaintiff could return to work on permanent modified duty involving limiting lifting, pulling, and pushing to 25 pounds.  (AR 760-764.)

From November 2010 to July 2011, Plaintiff reported his right leg "giving way" (AR 679), persistent and acute low back pain radiating mostly to the right buttock and leg; occasional numbness and tingling; difficulty sitting, sleeping, and standing for long periods; and diminished range of motion.  (AR 524, 541, 553, 562, 567, 571, 576, 590, 786.)  Dr. Mehta observed tenderness in Plaintiff's low back, particularly on the right side, and noted that Plaintiff had low back spasms, diminished range of motion, and abnormal straight-leg tests on the right side.  (AR 571, 583, 590, 597, 601, 605, 718, 787.)  Neurological exams consistently yielded normal results. (*See, e.g.*, AR 252, 542, 554, 571.)

In March 2011, Dr. Mehta ordered a second MRI.  Based on the reviewing radiologist's impressions, Dr. Mehta diagnosed Plaintiff with multilevel degenerative disc disease in the lumbar

---

[12] Todd's paralysis is one-sided weakness after a seizure that affects speech and vision.  *See Todd's Paresis*, WIKIPEDIA.org, https://en.wikipedia.org/wiki/Todd's_paresis (last visited June 1, 2016).

[13] Specifically, they administered enoxaparin.  *Enoxaparin*, DRUGS.com, http://www.drugs.com/cdi/enoxaparin.html (last visited June 1, 2016).

United States District Court
Northern District of California

spine with disc bulging, combined with bone spurs and facet joint hypertrophy,[14] causing

significant stenosis; loss of curvature in the lumbar spine with significant degenerative changes;

and borderline stenosis of the central spinal canal in the lumbosacral region. (AR 790, 794.)

During this time, Plaintiff's medications included Vicodin, Soma, and Robaxin[15] for pain,

and Dr. Mehta also prescribed an at-home heat and exercise program, a TENS unit,[16] a lumbar

brace, and a cane.  (AR 539, 543, 573, 587, 602, 607, 718-719, 739-740.)  Plaintiff's insurance

company continued to deny Dr. Mehta's requests for epidural steroid injections.  (*See, e.g.*, AR

568, 573, 580, 591, 602, 666, 740.)  Throughout 2011, Dr. Mehta repeatedly indicated that

Plaintiff could return to work on permanent modified duty involving limited stooping and

bending, wearing a back support, and limiting lifting, pulling, and pushing to 25 pounds.  (AR

460, 462-463, 547, 748, 750-757.)

Also throughout 2011, Plaintiff sought medical attention at Highland Hospital several

times for Vicodin refills for his back pain because he lost his worker's compensation coverage

when he lost his job and ran out of his old prescriptions.  (*See, e.g.*, AR 834.)  During these visits

he complained of chronic and consistent low back pain that improved with Vicodin, rest, and hot

compresses and worsened with long periods of standing, with pain radiating to his right leg.  (AR

828, 831, 834.)  Physicians observed tenderness in Plaintiff's low back but consistently noted that

his gait was normal, and at one visit Plaintiff reported "ambulating well."  (*See, e.g.*, AR 827-828,

831, 834, 838.)  The doctors renewed Plaintiff's Vicodin prescription to treat his back pain.

---

[14] Facet joint hypertrophy is degeneration of joints between vertebrae causing pain along the nerve path. *See Hypertrophic Facet Disease Definition*, Spine-health, http://www.spine-health.com/glossary/hypertrophic-facet-disease (last visited June 1, 2016).

[15] Robaxin is a muscle relaxant. *Robaxin*, DRUGS/com, http://www.drugs.com/robaxin.html (last visited June 1, 2016).

[16] A transcutaneous electrical nerve stimulation ("TENS") unit uses electric current to stimulate nerves to treat nerve-related pain conditions. *See What is a Tens Unit?*, TensUnits.com, http://www.tensunits.com/ (last visited June 1, 2016).

United States District Court
Northern District of California

4.      *2011 Emergency Room Visit for Right Upper Extremity Weakness*

In November 2011, Plaintiff went to the emergency room at Alta Bates Summit Medical Center, where physicians admitted him under stroke protocol because he presented with sudden right-sided weakness, slurred speech, and a facial droop.  (AR 848, 857, 874.)  Plaintiff's girlfriend reported that he had seemed "off" all day, had fainted twice in a row, and had slurred speech and right-sided weakness when he regained consciousness.  (AR 846, 855.)  By the time Plaintiff arrived at the emergency room, his speech was no longer slurred and his facial droop had mostly resolved, but he continued to display right sided weakness and could not recall names.  (AR 846-847, 854.)  He reported recent tingling and numbness in his right hand and decreased sensation in his right leg, and doctors observed that Plaintiff could not lift his right leg off the bed for more than 2-3 seconds.  (AR 847, 855.)  Plaintiff reported drinking vodka that day, and records reflect that his blood alcohol level was 0.24.  (AR 847-848, 850, 882.)

On the date of Plaintiff's admission, the consulting neurologist opined that Plaintiff may have suffered a stroke, noting "possible acute cerebrovascular accident (thrombotic stroke)" (AR 854), "right-sided weakness suspicious for acute stroke[]" (AR 856), and "symptoms [] consistent with acute stroke."  (AR 857.)  The neurologist recommended upgrading Plaintiff's secondary-stroke prevention medication from aspirin to Aggrenox,[17] discussed with Plaintiff the risks and benefits of the stroke treatment tPA,[18] and recommended frequent neurology check-ups.  (AR 846-848.)  The treating emergency room physician also opined that Plaintiff's right sided weakness symptoms were consistent with acute stroke.  (AR 857.)

However, because Plaintiff's reflexes were normal and symmetrical (AR 847), and tests showed no injury or acute abnormality (AR 859, 862-65, 872, 874-875), the consulting neurologist later concluded that Plaintiff did not have a stroke, writing: "We suspect his symptoms are likely

---

[17] Aggrenox contains a combination of aspirin and an anti-clotting drug and is used to reduce the risk of stroke in people who have had blood clots or TIA.  *Aggrenox*, DRUGS.com, http://www.drugs.com/aggrenox.html (last visited June 1, 2016).

[18] Tissue plasminogen activator treats strokes by dissolving blood clots to improve blood flow to the brain.  *See TPA*, Wikipedia, https://en.wikipedia.org/wiki/Tissue_plasminogen_activator (last visited June 1, 2016).

United States District Court
Northern District of California

due to polysubstance abuse with cocaine and alcohol.  Furthermore, it could be re-expression of his old stroke as his alcohol level was fairly high on admission." (AR 875.)  Upon discharge, physicians diagnosed Plaintiff with resolving right-sided weakness and slurred speech "[l]ikely secondary to polysubstance abuse with cocaine, alcohol, marijuana[.]" (AR 874.)  Records indicate that Plaintiff walked 200 feet without assistance on the day of discharge, but because he "still [had] some mild right-sided weakness[,]" doctors recommended at-home physical and occupational therapy.  (AR 875.)  Plaintiff's medications upon discharge included Aggrenox for the stroke-related symptoms and Vicodin for his pain.  (AR 847, 875.)

> ### 5. *Medical History through 2013: Continued Back Pain, Right-Sided Weakness, and Miscellaneous Hospital Visits*

Plaintiff's back pain and right-sided weakness persisted, and he regularly visited Dr. Faith Crumpler from November 2011 until June 2013.  During that time, Plaintiff complained of lost but improving use of his right arm and leg (AR 890), a weak right knee resulting in falls (AR 939, 940), chronic back pain and spasms (*see, e.g.*, AR 889, 922-923 934, 985, 889, 940), and depression (AR 936, 934).

Dr. Crumpler noted that Plaintiff suffered from back pain and mild stroke.  (AR 889.)  She observed that Plaintiff had muscle spasms, decreased strength and tone in his right arm and leg, lumbosacral spine tenderness, and tension in the lower back.  (*See, e.g.*, AR 888-890, 928, 939-940, 982.)  She also observed that Plaintiff winced with certain movements (AR 940), had right knee crepitus[19] (AR 940), engaged in slow, deliberate movements (AR 939), and had a markedly diminished range of motion (AR 925, 928, 934).  Further Plaintiff appeared to be in general discomfort, presented in a stooped and asymmetric posture, and was unable to sit still (AR 928, 934, 938.)  Radiology reports from 2012 reflect chronic degenerative disc disease in Plaintiff's lumbar spine, slight slippage of certain vertebrae, and mild scoliosis.  (AR 947.)

---

[19] Crepitus, characterized by a peculiar cracking, crinkly, or grating feeling or sound under a joint, may indicate cartilage wear in the joint space.  *Crepitus*, MedicineNet.com, http://www.medicinenet.com/script/main/art.asp?articlekey=12061 (last visited June 1, 2016.)

1       During this time, Plaintiff's medications included Naproxen, Vicodin, Baclofen,[20]

2   Flexeril,[21] acetaminophen, Tylenol with codeine, Tramadol XR,[22] and Lidoderm patches[23] for

3   pain, and Aggrenox for the stroke-related symptoms.  (*See* AR 922-941.)  Sometimes, Dr.

4   Crumpler's notes indicate that medications were helping Plaintiff's back pain, but other times that

5   pain persisted and the medication did not ease it.  (*Compare, e.g.*, AR 938, *with* AR 939.)  Plaintiff

6   also underwent physical and occupational therapy at home to treat his back pain.  (*See, e.g.*, AR

7   890.)  Dr. Crumpler consistently noted that Plaintiff used a cane to walk (*see, e.g.*, AR 922, 935,

8   939-940, 977, 985), and by March 2012 suggested that he switch to a four-pronged cane and

9   consider a knee brace due to his instability and weakness.  (AR 939.)

10       In October 2012, Plaintiff went to the Highland Hospital emergency room complaining of

11   severe neck and back pain after falling down a flight of stairs.  (AR 954.)  He appeared intoxicated

12   but able to walk, and scans showed no acute injury but multiple levels of mild, chronic

13   degenerative disc disease, stenosis and disc bulging.  (AR 954-955, 960-962.)  Doctors prescribed

14   Ibuprofen and Vicodin for back pain and noted that Plaintiff left the emergency department with a

15   steady gait.  (AR 956, 958.)  Six weeks later, Plaintiff returned to the Highland Hospital

16   emergency room complaining of severe chronic back and sciatic pain exacerbated by sitting and

17   standing for long periods, pain radiating down the back of his leg, nerve dysfunction, numbness

18   and tingling, and insomnia.  (AR 963.)  He reported that neither physical therapy nor medication

19   helped.  (AR 963.)  Doctors diagnosed chronic lower back pain and depression with insomnia, and

22   [20] Baclofen is a muscle relaxer and anti-spastic agent.  Baclofen, DRUGS.com,
    http://www.drugs.com/baclofen.html (last visited June 1, 2016).

24   [21] Flexeril is a muscle relaxant.  *Flexeril*, DRUGS.com, www.drugs.com/flexeril.html (last visited
    June 1, 2016).

25   [22] Tramadol XR is an extended-release form of the narcotic-like pain reliever tramadol.  *Tramadol*,
26   DRUGS.com, http://www.drugs.com/tramadol.html (last visited June 1, 2016).

27   [23] Lidoderm is a local anesthetic.  *Lidoderm Patch*, DRUGS.com,
    http://www.drugs.com/cdi/lidoderm-patch.html (last visited June 1, 2016).

United States District Court
Northern District of California

suggested a referral to physical therapy or acupuncture at his next visit.  (AR 964.)  Plaintiff

continued taking Vicodin, Soma, ibuprofen, and Tylenol with codeine for pain.   (AR 956, 963.)

    6.    *2012 to 2013 Medical History: Mental Health Treatment*

Beginning in August 2012, psychiatrist Dr. Jabari Jones treated Plaintiff for depression and

anxiety.  At Plaintiff's first visit, he reported depressed feelings following a back injury, decreased

sleep and energy, fluctuating appetite, and anxiety with racing thoughts and guilt.  (AR 929.)  Dr.

Jones diagnosed Plaintiff with anxiety disorder and single-episode, chronic major depression,

moderate psychosocial and environmental problems related to finances and occupation, and

assigned him a global functioning assessment ("GAF")[24] score of 60.  (AR 930-931.)  Dr. Jones

increased Plaintiff's dosage of Cymbalta[25] and prescribed Trazodone[26] to assist with his insomnia,

and instructed Plaintiff to follow up with a social worker.  (AR 931, 984, 989-990.)

In the months that followed, Plaintiff reported some improvement of his depression due to

medication, but problems persisted.  For example, in June 2012 Plaintiff's primary care physician,

Dr. Crumpler, noted that Plaintiff's depression was stable.  (AR 936.)  In November 2012,

Plaintiff reported to Dr. Jones that, while medication helped, he still experienced anxiety and a

depressed mood associated with the anniversary of his mother's death, the holidays, and his recent

loss of general assistance income.  (AR 990.)  A month later, Plaintiff reported that his sleep,

---

[24] The GAF is a numeric scale that mental health clinicians and physicians use to rate the social, occupational, and psychological functioning of adults.  A score of 41-50 signifies serious symptoms such as suicidal ideation, severe obsessional rituals, or frequent rituals or any serious impairment in social, occupational, or school functioning such as a lack of friends, inability to keep a job or work.  A score of 51-60 implies moderate symptoms such as flat affect, circumlocutory speech, occasional panic attacks or moderate difficulty in social, occupational, or school functioning.  A score of 61-70 indicates some mild symptoms such as depressed mood and mild insomnia or some difficulty in social, occupational, or school functioning, but generally good functioning with some meaningful interpersonal relationships.  *Global Assessment of Functioning*, WIKIPEDIA.org, http://en.wikipedia.org/wiki/ Global_Assessment_ of_Functioning (last visited June 2, 2016).

[25] Cymbalta is an antidepressant used to treat depression and anxiety.  *See* Cymbalta, Drugs.com, http://www.drugs.com/cymbalta.html (last visited June 2, 2016).

[26] Trazodone is an antidepressant used to treat major depressive disorder.  *See* Trazodone, Drugs.com, http://www.drugs.com/search.php?searchterm=trazodone (last visited June 2, 2016).

appetite, and energy had improved, but he still felt anxious; Dr. Jones indicated that Plaintiff's affect was reactive, depressed, and flat and that his mood ranged from "so-so" to depressed, but his memory and concentration were intact and his thought process was goal-directed and logical. (AR 989-990.)  Dr. Jones assigned Plaintiff a 50-55 GAF score at this visit.  (AR 989-990.)

In early 2013, Plaintiff still complained of decreased sleep, appetite, memory, and concentration, and of feeling "'down and not energetic[,]" but he also reported that he was sleeping more and seeing a therapist.  (AR 983-984.)  By April, Dr. Jones noted that while Plaintiff reported an "okay" mood and no issues with sleep, appetite, energy, or anxiety, he also complained of decreased concentration and stress.  (AR 979.)  Dr. Jones stated that Plaintiff had appropriate affect and logical thought processes and maintained attention; the diagnosis went unchanged, but he increased Plaintiff's GAF score to 63.  (AR 979-980.)

B.     Medical Evaluations

Apart from routine and emergency medical visits, Plaintiff underwent several examinations to measure his functional capacity in support of his applications for disability benefits.  Dr. Mehta, one of Plaintiff's primary care specialists during the relevant time period, did not submit an evaluation, but treating physicians Drs. Crumpler and Jones did.  Consultative examiners Drs. Jonathan Schwartz and Robin Soffer completed evaluations at the SSA's request.  Drs. I. Newton and B. Williams, nonexamining state agency medical consultants, also completed evaluations.

1.     *Medical Evaluations Regarding Plaintiff's Physical Impairments*

a.     Dr. Jonathan Schwartz

In October 2010, consultative medical examiner Dr. Jonathan Schwartz met with Plaintiff to conduct a comprehensive internal medicine evaluation and assess Plaintiff's functional capacity. (AR 616.)  Prior to the examination, Dr. Schwartz reviewed part of Plaintiff's SSA disability report and physician progress notes.  (*Id*.)  At the time of the examination, Plaintiff complained of intense, daily lower back pain that improved when he lay down and caused difficulty sitting, standing, and walking.  (*Id*.)  Dr. Schwartz stated that Plaintiff was able to dress himself, take care of his own hygiene, and occasionally shop but he did not do any household chores or yard work. (*Id*.)  Dr. Schwartz noted that Plaintiff took opiates and muscle relaxants for pain.  (*Id*.)

United States District Court
Northern District of California

1       Dr. Schwartz observed that Plaintiff was not in acute distress, was able to walk into the

2  exam room with a cane and to transfer himself from a chair to the exam table, and sat comfortably.

3  (AR 617.)  Specifically, he observed that Plaintiff had normal gait, muscle tone, strength, grip,

4  balance, and range of motion in the cervical spine, elbows, wrists, fingers, and thumbs.  (AR 618-

5  619.)  He also observed mild tenderness to palpitation in Plaintiff's lower back, slightly reduced

6  range of motion in the lumbar spine, hips, and shoulders, and noted that he could not perform a

7  straight-leg test because of Plaintiff's back pain.  (AR 617-619.)  Dr. Schwartz diagnosed Plaintiff

8  with low back pain "likely secondary to degenerative changes of the spine with possible" radiation

9  to the legs and decreased range of motion of the lumbar spine.  (AR 619.)

10       As far as Plaintiff's functional capacity, Dr. Schwartz concluded that Plaintiff would be

11  able to stand and walk for up to six hours and to sit up to six hours.  (*Id.*)  Dr. Schwartz opined

12  that Plaintiff's cane, which was prescribed and used for long distances, was not medically

13  necessary based on his objective exam findings.  (AR 618.)  He further concluded that Plaintiff

14  could lift and carry 20 pounds occasionally and 10 pounds frequently, and that Plaintiff could only

15  occasionally stoop and crouch due to his decreased range of motion in his lumbar spine.  (*Id.*)

16                b.     Dr. Robin Soffer

17       In April 2012, Dr. Soffer, a consultative medical examiner, met with Plaintiff and

18  conducted a neurological examination.  (AR 896.)  Prior to the exam, Dr. Soffer reviewed portions

19  of Plaintiff's emergency room notes from January, July, and October 2011, and chest x-ray reports

20  from May and August 2011, all of which she noted were "generally incomplete."  (AR 896.)  Dr.

21  Soffer did not review treatment notes from Alta Bates Hospital or from any inpatient

22  hospitalizations, including Plaintiff's 2009, February 2011,[27] or November 2011 hospitalizations

23  relating to fainting and right-sided weakness episodes.  (AR 896.)

24       Dr. Soffer noted that Plaintiff suffered right-sided tremors in his hand and possibly his

25  face, right-sided numbness in his face and leg, occasional pain in his right leg, and low back pain.

26  (AR 896-897.)  She stated that pain and weakness on his right side meant that Plaintiff could not

27

28

[27] Plaintiff also alleges a February 2009 hospitalization for a fainting and right-sided weakness episode, but the record does not contain evidence of that hospitalization.  (*See* AR 24.)

1    drive; needed a cane to walk; fell three times per week and thus could not leave the house alone;

2    required assistance and adult supervision for most daily activities, including dressing and personal

3    hygiene; did not shop, cook, or clean; and had to lay down and nap frequently.  (AR 896-897.)

4          Dr. Soffer observed that Plaintiff "got up multiple times during the visit to stand because

5    of discomfort while sitting" (AR 898), and that his balance worsened without the cane that he held

6    with his left hand.  (AR 899.)  Dr. Soffer further observed tenderness throughout Plaintiff's back,

7    that his right leg was more outwardly rotated than his left, and that he swung his right leg outward

8    in a semi-circle when he walked.  (*Id.*)  Dr. Soffer also noted that Plaintiff exhibited decreased

9    range of motion in his right knee and ankle extensors and right hip flexors and complained of back

10   pain when he squatted and when Dr. Soffer tested his hip joints.  (*Id.*)

11         Dr. Soffer observed that Plaintiff's right arm remained flexed at his side when he walked,

12   his right-sided finger-to-nose movements "were slow and clumsy in proportion to weakness[,]"

13   and he avoided using his right hand except during a failed attempt to button his left shirt cuff.

14   (*Id.*)  Plaintiff was slow to pick up objects with his right hand; had less power, grip, sensation, and

15   decreased range of motion in his right fingers, wrist, arm, elbow, and shoulder; and crepitus in his

16   right shoulder.  (AR 899-900.)  Dr. Soffer also noted very mild right central facial weakness,

17   slurred speech, and mild right-sided tongue weakness; markedly decreased position sense and

18   mildly decreased sensation in Plaintiff's right leg; and diminished reflexes on both sides.  (AR

19   900.)  However, Plaintiff's neurological exam results were normal.  (*Id.*)

20         Dr. Soffer diagnosed Plaintiff with chronic low back pain with occasional radiation to the

21   right leg and a history of stroke.  (AR 900.)  She concluded that Plaintiff's "stroke [was] probably

22   subcortical and due to hypertension[,]" and stated that although Plaintiff lacked "many objective

23   signs of stroke[,]" he "nonetheless [] appear[ed] to have evidence of left brain stroke with residual

24   right hemiparesis and hemisensory deficit" and had "multiple risk factors for stroke."  (AR 900.)

25   Dr. Soffer noted that she could not exclude the possibility that Plaintiff was elaborating symptoms,

26   given that he got into the driver's seat of his car independently, threw his cane into the backseat

27   with his right arm, and drove away with both hands on the wheel.  (AR 898, 900.)

28

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1    In assessing Plaintiff's functional capacity, Dr. Soffer opined that Plaintiff could stand and

2  walk for a maximum of two hours in an eight-hour work day and for no more than 15 minutes at a

3  time or per hour, would require a quad cane, and could benefit from a right ankle-foot orthosis.

4  (AR 900.)  Plaintiff would be able to sit for up to four hours per day but no more than one hour at

5  a time.  (*Id.*)  He would not be able to work a full eight-hour shift on a consistent basis because of

6  his need to lay down for pain relief and naps.  (*Id.*)

7    With respect to exertional limitations, Dr. Soffer opined that Plaintiff could lift and carry

8  up to 10 pounds of weight occasionally only with his right hand, since he uses a cane with his left

9  hand.  (AR 901.)  As for exertional and environmental limitations:

> The claimant cannot climb ladders independently.  He cannot climb
> stairs independently even with a cane and handrail.  The claimant
> cannot balance, stoop, kneel, crawl or crouch due to decreased
> balance and problems.  When seated, the claimant has no limitations
> of left upper extremity reaching, handling, feeling and fingering.  He
> cannot reach above shoulder height with his right hand and can only
> reach to shoulder height occasionally because of fatigue.  Due to
> weakness and sensory of the right hand, the right hand can serve
> primarily only as a functional assist on a frequent[ ] basis.  The
> claimant cannot work at heights, around heavy machinery or near
> extremes of temperature due to decreased balance.  He cannot work
> around chemicals, excessive dust, fumes, or gasses due to chronic
> obstructive pulmonary disease . . . He can take public transportation
> with handicap provisions as long as he is not required to ascend or
> descend stairs for this purpose.  Otherwise, he would require
> paratransit.

(*Id.*)

c.    Dr. Faith Crumpler

On October 17, 2012, treating physician Dr. Crumpler, who had seen Plaintiff once a

month for nearly a year, completed a medical assessment.  (AR 917-919.)  She noted that his

symptoms included chronic weakness due to stroke and chronic back pain.  (AR 917.)  Asked to

identify objective findings that confirm that condition, Dr. Crumpler wrote that Plaintiff "has lots

of problems [with] ambulation and movement despite using a cane."  (*Id.*)

In assessing Plaintiff's functional capacity, Dr. Crumpler opined that Plaintiff could sit

frequently for a continuous period but only for a total of two hours in an eight-hour period due to

chronic pain.  (AR 917-918.)  She concluded that Plaintiff could only stand and/or walk for

"maybe 5 minutes" in an eight hour work day due to weakness and chronic back pain.  (AR 918.)

Dr. Crumpler opined that Plaintiff could rarely lift 10 pounds or less and could never lift greater

weights due to his weakness and stiffness, could rarely bend and reach above shoulder level, and

could never squat.  (*Id.*)  She further concluded that Plaintiff's pain would completely undermine

his ability to sustain a work routine due to his limitations in concentration, persistence, and pace

because he "has to continuously change position to remain even somewhat comfortable[,]" and

noted that he has been functioning at this level since their first meeting in 2011.  (AR 918-919.)

#### d.       Drs. I. Newton & B. Williams

State agency reviewing medical consultants Drs. I. Newton and B. Williams reviewed

Plaintiff's medical records and completed residual functional capacity ("RFC") assessments in

2012 in connection with the SSA's initial disability determination.  (AR 94, 96-97, 113-114.)

They reviewed Plaintiff's medical records and the opinions of Drs. Crumpler and Soffer (AR 96,

112-113), and concluded that "[t]his is not a clear cut case of 'stroke[,]'" calling it "unfortunate"

that Dr. Soffer did not review the November 2011 records from Alta Bates because the treating

doctors there "changed their minds from stroke to polysubstance abuse causing temporary

neurological signs.  In fact, [Plaintiff] does not have 'hard' signs of [stroke] now."  (AR 97.)  In

rejecting a stroke diagnosis and opining that Plaintiff's cane is not a medical necessity, they cited

Dr. Soffer's observation that Plaintiff walked to his car and threw his cane in the backseat with his

right hand.  (AR 94, 97.)  Drs. Newton and Williams opined that Plaintiff could occasionally lift

20 pounds, frequently lift ten pounds, and could stand or walk a total of six hours in an eight-hour

workday and sit a total of six hours in an eight-hour workday.  (AR 96-97.)  They noted no other

postural or other limitations and concluded that Plaintiff's cane was not medically necessary.  (*Id.*)

#### 2.       *Medical Evaluations Regarding Plaintiff's Mental Impairments*

#### a.       Dr. Ahmed El-Sokkary

On March 21, 2012, consultative medical examiner Dr. Ahmed El-Sokkary met with

Plaintiff and conducted a consultative psychiatric examination.  (AR 891, 892.)  Dr. El-Sokkary

wrote a letter to the Department of Social Services describing his findings and completed a

Medical Source Statement.  (AR 891-895.)  Dr. El-Sokkary observed that Plaintiff, who walked

United States District Court
Northern District of California

17

into the examination using a cane and appeared to be in pain, appeared "internally preoccupied from time to time." (AR 891-892.)  He noted that Plaintiff could not remember any words on delayed recall but could immediately recall three of three words and spell "world" backward on the second try, had insight and judgment within normal limits, and exhibited a goal-directed thought process. (AR 892.)  Dr. El-Sokkary diagnosed Plaintiff with "[a]djustment disorder, with mixed anxiety and depressed mood," and unspecified cognitive disorder, and identified social, financial, occupational, and medical issues as his major psychosocial stressors. (AR 893.)  He assigned Plaintiff a GAF score of 62. (AR 893.)

Dr. El-Sokkary opined that Plaintiff could understand, remember, and perform simple tasks; interact appropriately with supervisors and coworkers; and manage money. (AR 893.)  He concluded that Plaintiff "struggled to maintain a sufficient level of concentration, persistence, and pace which indicate[d] that he would continue to struggle in a competitive work setting." (*Id.*)

b.      Dr. Sylvia Torrez

On October 12, 2010, Dr. Sylvia Torrez, a consultative psychological examiner, met with Plaintiff and conducted a comprehensive psychiatric evaluation after reviewing his disability report form and workers' compensation-related medical records from 2008 to 2010. (*Id.*)

Dr. Torrez observed that Plaintiff responded to questions open and honestly, did not appear to exaggerate his symptoms, and was able to "attend, focus, and follow through with all tasks asked of him." (AR 613.)  She diagnosed Plaintiff with alcohol and cannabis abuse, due to major psychosocial stressors including health, finances, and occupation, and assigned him a GAF score of 65. (AR 612-613.)  Dr. Torrez opined that "[d]espite [Plaintiff's] reported symptoms and history, he [did] not appear to be suffering from a major mental disorder[,]" and appeared to be functioning adequately. (AR 613.)  She concluded that Plaintiff's limitations, if any, and poor attitude toward seeking work resulted from his medical condition. (*Id.*)

Dr. Torrez concluded that Plaintiff was capable of managing his funds and had a good ability to understand and remember short and simple instructions, maintain concentration and attention, accept instructions from a supervisor, sustain an ordinary routine, interact with

coworkers, and deal with various changes in the work setting.  (*Id.*)  She further opined that he had a fair ability to complete a normal workday and workweek without constant interruptions.  (*Id.*)

c. Dr. Jabari Jones

In a mental functional assessment dated January 2013, treating psychiatrist Dr. Jabari Jones opined that Plaintiff suffers from major depression, anxiety disorder not otherwise specified, and occasional cannabis use.  (AR 975.)  Dr. Jones noted that Plaintiff's symptoms included "[r]epressed mood; constricted affect; anxiety; poor energy, [and] poor concentration" and that Plaintiff's condition was chronic, relapsing, and remitting and his prognosis was uncertain.  (AR 975-976.)  Plaintiff's condition slightly impaired his activities of daily living and social functioning, and markedly impaired his concentration, persistence, pace, and ability to adapt to work-type settings.  (AR 975-976.)

## II. The ALJ Hearing

On November 12, 2013, Plaintiff appeared with counsel at his scheduled hearing before ALJ Robert Wenten in Oakland, California.  (AR 43.)  Plaintiff and Vocational Expert ("VE") Lawrence Hughes both testified at the hearing.  (AR 43.)

A. <u>Plaintiff's Testimony</u>

Plaintiff suffers from right-sided weakness, low back pain, depression, and anxiety.  (AR 49, 56, 65.)  He lives with his fiancée and is unemployed; general assistance is his only income.  (AR 47, 65.)  Because of his right-sided weakness, Plaintiff requires his fiancée's help to bathe and dress.  (AR 49-51.)  He uses a cane at home when he feels weak and when he goes outside because he loses his balance and his right leg sometimes "gives out" on him, which causes him to fall down, which in turn exacerbates his pain.  (AR 53-55.)  He can lift his right arm and shoulder and sometimes his right hand, but it is painful and difficult to do so.  (AR 49-50, 60-61.)  Plaintiff is left-handed; he uses only his left hand to do most things.  (AR 50-52, 62-63.)

Plaintiff's back pain stems from a workplace injury sustained when a refrigerator that he was loading onto a truck fell on his back.  (AR 64.)  After the injury, Plaintiff worked until his employer ran out of light-duty work and fired him, but he testified that he could not have continued even the light-duty work because "the pain was too bad[.]"  (AR 65.)  Plaintiff's doctor

19

made "several requests" for epidural steroid injections and "always stated that [Plaintiff] really needed them[,]" but workers' compensation denied the requests, and also denied one physician's request for back surgery.  (AR 68-69, 897.)  Physical therapy did not help Plaintiff's pain, and while he currently takes Valium and Tylenol with codeine, these only "kind of" ease his pain.  (AR 57, 63, 68.)  Even with medication, it is "excruciatingly painful" for Plaintiff to lean on his cane while bending or stooping to pick up something from the floor and to sit or stand for a long time.  (AR 55-57.)  Plaintiff is most comfortable when he lies down, which he does for three to four hours between 8:00 a.m. and 5:00 p.m. each day.  (AR 64.)  Plaintiff's pain makes it difficult for him to sleep.  (*Id.*)  Aside from the occasional beer, Plaintiff no longer drinks alcohol, but he occasionally uses medical marijuana because it "helps the pain a lot[.]"  (AR 58-59.)

Plaintiff suffers from depression and anxiety and has a prescription for Cymbalta.  (AR 63, 65.)  He cries frequently because his constant pain keeps him from doing things he used to enjoy, like bowling and watching sports, and he finds it difficult to concentrate when he watches TV because his mind wanders to his depression and anxiety.  (AR 66.)

Plaintiff also testified about his daily activities and abilities.  His fiancée does all household chores, including grocery shopping, cooking, and washing dishes.  (AR 67.)  His typical day involves "[w]atching TV, talking on the telephone, and if [he is] feeling sort of good [he will] try to take a little walk around the corner."  (AR 59.)  Plaintiff talks to friends on the phone but does not see them in person because they live too far away.  (AR 60.)

B.     Vocational Expert's Testimony

At the ALJ's request, VE Lawrence Hughes, who listened to Plaintiff's testimony and reviewed his file, testified to the classifications of Plaintiff's vocational history, identified the exertional and skill levels of those jobs, and ultimately provided testimony as to whether Plaintiff could perform that past relevant work.  Although there was some initial confusion about Plaintiff's duties in his prior occupation, the VE classified Plaintiff as (1) a truck driver for appliances and delivery, a semi-skilled job with a medium exertional level; (2) a warehouse worker, an unskilled job with a medium exertional level; (3) a forklift driver, also an unskilled job with a medium exertional level; and (4) a delivery supervisor, a skilled job with a light exertional level.  (AR 74.)

1
2
3
4
5
6
7
8
9

United States District Court
Northern District of California

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

        The ALJ then posed several hypotheticals to the VE to determine whether there were jobs existing in significant numbers in the national economy that Plaintiff could perform given his impairments.  The first hypothetical assumed the following limitations: light work, meaning "lifting 20 pounds occasionally and 10 pounds rather frequently," and standing and walking for six hours of an eight-hour day.  (AR 76.)  When asked whether he considered an assistant delivery supervisor job a light-exertion job, the VE replied that he would "expect it to be light because it's an administrative job[,]" but that it may have been a medium-exertion job for Plaintiff "by choice."  (AR 76.)  The VE did not actually answer whether a person with these limitations would be able to perform Plaintiff's past work.  (AR 76-77.)

        The ALJ next asked whether it would affect the hypothetical person's capacity to do light work if, "in addition to being capable to light work, [a person] had a restriction that required that he occasionally had to use a cane for stability . . . in his non-dominant hand[.]"  (AR 77.)  The VE responded that he would not expect such a limitation to have a "great impact" in a delivery supervisor or assistant job.  (AR 77.)  When the ALJ asked whether a balance issue would affect a person's "capacity to perform unskilled light work generally[,]" the VE opined that such an issue "would have a great impact[]" and "would almost preclude it."  (AR 77.)  The VE identified 281 jobs with a specific vocational level ("SVP") of 3 that required occasional or no balancing and only light exertion, and 2,630 jobs requiring an SVP of 3, light exertion, and "no more than occasional" balancing.  (AR 78.)  But the VE explained that balancing "defined as walking or moving over some sort of unusual surface, narrow, slippery or erratically moving[,]" not "[j]ust walking across the floor[,]" which was why there were so many responsive jobs.  (AR 79-80.)

        The ALJ then presented a hypothetical in which the same person "had some restrictions in remembering detailed instructions, in other words, he was capable of remembering one and two-step kinds of instructions, but if instructions were more complex he would have difficulty remembering complex instructions and difficulty in making reasoned decisions[.]"  (AR 80.)  The VE responded that he "wouldn't expect [that limitation] to have a great impact on unskilled work of any exertional requirement."  (AR 80-81.)

21

United States District Court
Northern District of California

The ALJ's next hypothetical assumed a person limited to light work who "had only limited use of his right non-master arm[,]" but could move the arm and was capable of "occasional fingering and occasional handling with the right non-master hand[.]" (AR 81.)  The VE opined that such an individual could do light, unskilled, SVP 2 work as an usher (DOT 344.677-014, of which 3,000 jobs exist locally), a children's attendant (DOT 349.677-018, of which 8,000-9,000 jobs exist locally), or a tanning salon attendant (DOT 359.567-014, of which 1,500 jobs exist locally), as well as "a couple" other jobs, although the VE did not specify which.  (AR 81-82.)

Plaintiff's counsel then asked the VE whether an individual with Plaintiff's work experience would have transferrable skills to a sedentary job.  (AR 82.)  The VE answered yes, noting that such an individual's skills would transfer to jobs as an appointment clerk, receptionist, or telemarketer.  (AR 82.)  Plaintiff's counsel next posed another hypothetical intended to be based on the limitations that Drs. Crumpler, Soffer, and Jones advised:  "[A]ssume an individual the same age, education, and work background.  Assume further that this individual is limited to sedentary work, but because of pain and depression would be off task 20 percent of the workday."  (AR 82-83.)  The VE testified that such an individual would be unable to perform Plaintiff's past work and unable to perform any other jobs.  (AR 83.)

C.      Other Evidence in the Record

In addition to live testimony, Plaintiff completed a Function Report, and both Glenda Harris and Cherise Earby completed Third Party Function Reports.  (AR 346-361.)

1.      *Ms. Harris's Third Party Function Report*

In August 28, 2010, Ms. Harris completed her Third Party Function Report; at that time, she had known Plaintiff for over 30 years and he was living with her.  (AR 302.)  She stated that Plaintiff was no longer able to work, play sports, sit for long periods, or be active like he used to be, and that he tosses and turns in his sleep because of his back pain.  (AR 303.)  She stated that he has problems dressing because of pain and cannot sit in the tub.  (*Id.*)  According to Ms. Harris, Plaintiff cannot stand and cook or do outdoor chores, though inside he sometimes irons when necessary.  (AR 304.)  She reported that he no longer drives or goes anywhere due to back pain, and spends his time reading and watching television.  (AR 306.)  Ms. Harris reported that

Plaintiff's condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb

stairs, complete tasks, and concentrate.  (AR 307.)  She stated that he can only walk two blocks

before requiring a 15-minute break, and that he uses a cane to walk every day.  (AR 307-308.)

### 2.   *Plaintiff's Function Report*

In his report dated February 14, 2012 Plaintiff explained that he is no longer able to work,

workout, bowl, play sports, walk long distances, sit for long periods, cook, grocery shop, groom

himself, pick up his grandchild, or make the bed due to his condition.  (AR 347.)  He also cannot

engage in yard work because it requires bending, lifting, and stooping, which his right-sided

weakness precludes.  (AR 349.)  The condition affects his sleep because he cannot lay comfortable

or hurry to the bathroom during the night.  (AR 347.)  However, he reported that he is able to iron,

clean mirrors, and wipe down the car.  (AR 348.)

In terms of personal care, Plaintiff cannot button his shirt, tie his shoes, or put on pants

alone; he needs help washing up and getting in and out of the tub; his condition affects his ability

to brush and wash his hair, and he sometimes needs assistance to use the toilet.  (*Id.*)  He needs

reminders to take his medicine and attend appointments.  (AR 348, 350.)  He is able to go outside

several times per day and regularly attends church, but fears losing his balance or falling when he

goes out alone.  (AR 349.)  As for hobbies and interests, due to his injuries Plaintiff can only

watch television because his back pain prevents him from engaging in his old activities, like

working out, attending sporting events, and driving distances.  (AR 350.)

Plaintiff has difficulty lifting, squatting, bending, standing, reaching, walking, sitting,

kneeling, stair-climbing, concentrating, understanding, following instructions, and using his hands

due to his condition.  (AR 351.)  He can walk one block before he needs a five-minute break, uses

a cane when walking distances or standing up from sitting, and wears a brace.  (AR 351-352.)  He

can pay attention for 30 minutes, depending on how he feels.  (AR 351.)

### 3.   *Ms. Earby's Third Party Function Report*

Ms. Earby, who at the time of her written report had known Plaintiff for five years,

completed a Third Party Function Report on February 14, 2012.  According to Ms. Earby,

Plaintiff is no longer able to get to the bathroom on time, run, bend, stop, walk fast or long

United States District Court
Northern District of California

distances, sit for long periods, wash his lower body, get in and out of the bathtub, carry groceries, cook, groom himself, shop, or exercise.  (AR 355.)  He cannot sleep more than 30 minutes at a time or position himself comfortable due to his back pain.  (*Id.*)  Ms. Earby reported the same limitations in personal care, meals, house and yardwork, and physical abilities that Plaintiff did. (*Compare* AR 355-356, 351, *with* AR 347-348, 359.)  Sometimes he doesn't remember what he is doing and needs monitoring when engaged in activities.  (AR 348.)

## II.        The ALJ's Five-Step Evaluation

In a November 22, 2013 decision, the ALJ found Plaintiff not disabled under Sections 216(i) and 223(d) of the Social Security Act using the five-step disability analysis.  (AR 22-36.) At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 5, 2008, the alleged onset date.  (AR 24.)  At the second step, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, depression, and alcohol abuse.  (AR 24.)  At this step, the ALJ noted that Plaintiff alleged that he had suffered two strokes, in February 2011 and November 2011, but the ALJ concluded that no underlying documentation shows any stroke or similar event in February 2011 and that the November 2011 stroke was not a medically determinable impairment.  (AR 24-25.)

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 25.)  Considering Plaintiff's mental impairments under Section 12.04, the ALJ concluded that the evidence does not establish that Plaintiff satisfies the "paragraph B" criteria, which require two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."  (AR 25.)  The ALJ found Plaintiff mildly restricted in activities of daily living with mild difficulties in social functioning and moderate difficulties in maintaining concentration, persistence, or pace, and that Plaintiff experienced no decompensation episodes of extended duration.  (AR 26.)  The ALJ also found that the evidence fails to establish the presence of "paragraph C" criteria, which require at least one of the following: "repeated episodes of

24

decompensation; a residual disease process that has resulted in such marginal adjustment that a minimal increase in mental demands or environment would be predicted to cause decompensation; or an inability to function outside a highly supportive living arrangement." (AR 27.)

At step four, the ALJ found that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he can occasionally balance and occasionally finger and handle with his right non-dominant arm. (AR 27.) He also concluded that Plaintiff can work with simple instructions involving no complex reasoning or problem solving, meaning he can perform unskilled work generally. (AR 27.) In so concluding, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely reliable[.]" (AR 28-29.)

In assessing the physical component of Plaintiff's RFC, the ALJ gave great weight to the opinions of consultative examiner Dr. Schwartz and state agency medical consultants Drs. Newton and Williams, concluding that their opinions were most consistent with the overall medical evidence in the record. (AR 32.) The ALJ accorded little weight to consultative examiner Dr. Soffer's opinion, concluding that it was inconsistent with the actual examination findings and lack of objective signs of a stroke. (AR 32.) The ALJ also accorded little weight to treating physician Dr. Crumpler's opinion, finding it overly restrictive, not supported by the overall evidence in the record, and inconsistent with Dr. Soffer's April 2012 observation of Plaintiff's "ability to walk without a cane and use his right hand to throw the cane into the back seat of the car." (AR 32.)

In assessing the mental-health component of Plaintiff's RFC, the ALJ gave great weight to the March 2012 opinion of consultative psychological examiner Dr. El-Sokkary, concluding that the opinion was most consistent with the overall mental health treatment notes. (AR 32-33.) He gave little weight to treating physician Dr. Jones's January 2013 opinion that Plaintiff has marked impairment in concentration, persistence, and pace and marked impairment in the ability to adapt to work-type settings, finding that Dr. Jones's opinion was not well supported by his underlying treatment notes, which indicate that Plaintiff's symptoms had improved with medication and that he had only mild symptoms by April 2013. (AR 33-34.)

1      The ALJ found that Plaintiff is unable to perform any past relevant work based on the

2 VE's testimony.  (AR 35.)  But the ALJ also found that "there are jobs that exist in significant

3 numbers in the national economy that [Plaintiff] can perform" including usher, children's

4 attendant, tanning salon attendant, and "similar sedentary office clerk work."  (AR 35-36.)  The

5 ALJ concluded that the remainder of the hypotheticals posed at the hearing are not entitled to

6 significant weight because they are not supported by substantial evidence.  (AR 36.)  Having

7 determined that Plaintiff could perform other work, the ALJ found that Plaintiff was not disabled.

8 (AR 36.)

9 **STANDARD OF REVIEW**

10      Pursuant to 42 U.S.C. § 405(g), the Court has authority to review an ALJ's decision to

11 deny benefits.  When exercising this authority, however, the "Social Security Administration's

12 disability determination should be upheld unless it contains legal error or is not supported by

13 substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Andrews v.*

14 *Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

15 1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

16 adequate to support a conclusion"; it is "more than a mere scintilla, but may be less than a

17 preponderance."  *Molina*, 674 F.3d at 1110-11 (internal citations and quotation marks omitted);

18 *Andrews*, 53 F.3d at 1039 (same).  To determine whether the ALJ's decision is supported by

19 substantial evidence, the reviewing court "must consider the entire record as a whole and may not

20 affirm simply by isolating a specific quantum of supporting evidence."  *Hill v. Astrue*, 698 F.3d

21 1153, 1159 (9th Cir. 2012) (internal citations and quotation marks omitted).

22      Determinations of credibility, resolution of conflicts in medical testimony and all other

23 ambiguities are roles reserved for the ALJ.  *See Andrews*, 53 F.3d at 1039; *Magallenes*, 881 F.2d

24 at 750.  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the

25 record."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and

26 quotation marks omitted); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1198 (9th Cir.

27 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we

28 must defer to the ALJ's conclusion.").  "The court may not engage in second-guessing."

United States District Court
Northern District of California

*Tommasetti*, 533 F.3d at 1039.  "It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the Commissioner's determination as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, not the Court's, to resolve conflicts in the evidence."  *Bertrand v. Astrue*, No. 08-CV-00147-BAK, 2009 WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).  Similarly, "[a] decision of the ALJ will not be reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

However, the Court can only affirm the ALJ's findings based on reasoning that the ALJ himself asserted.  *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).  In other words, the Court's consideration is limited to "the grounds articulated by the agency[.]"  *Cequerra v. Sec'y*, 933 F.2d 735, 738 (9th Cir. 1991).

### DISCUSSION

Plaintiff contends that the ALJ erred as a matter of law by (1) improperly weighing the medical opinion evidence; and (2) failing to include right-sided weakness as a severe impairment.

**I.**     **ALJ's Consideration of Medical Opinion Evidence**

    A.     <u>Standard for Weighing Medical Opinion Evidence</u>

The ALJ must consider all medical opinion evidence.  *Tommasetti*, 533 F.3d at 1041 (citing 20 C.F.R. § 404.1527(b)).  The Ninth Circuit has "developed standards that guide [its] analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Specifically, a reviewing court must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The opinion of each is accorded a different level of deference, as "the opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician."  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *see also Orn*, 495 F.3d at 631 ("Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians[.]") (citation omitted).  Courts afford medical opinions of a treating

physicians superior weight because these physicians are in a special position to know plaintiffs as individuals and the continuity of the treatment improves their ability to understand and assess an individual's medical concerns.  *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).  If a treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence.  *See Ryan*, 528 F.3d at 1198.  The ALJ assigns "controlling weight" to a treating doctor's opinion where medically approved diagnostic techniques support the opinion and the opinion is consistent with other substantial evidence.  *See* 20 C.F.R. § 404.1527(d)(2); *Orn*, 495 F.3d at 632-33).  Similarly, the opinion of an examining doctor, even if controverted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009); *Ryan*, 528 F.3d at 1198; *Orn*, 495 F.3d at 632; *Andrews*, 53 F.3d at 1041.

"The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation thereof, and making findings."  *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986).  When determining which medical opinion should control, an ALJ looks to factors including the length of the treatment relationship, frequency of examination, nature and extent of treatment relationship, consistency of opinion, evidence supporting the opinion, and the doctor's specialization in order to determine how much weight to assign the opinion.  *See* 20 C.F.R. § 404.1527(c)(2)-(c)(6).  "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."  *Lester*, 81 F.3d at 831 (citation omitted).  "When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs.  In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion."  *Garrison*, 795 F.3d at 1012-13 (internal citation omitted).

B.      Analysis

United States District Court
Northern District of California

Plaintiff contends that the ALJ erred in giving too little weight to the opinions of the treating physicians, Drs. Crumpler and Jones, and examining physician Dr. Soffer, and too much weight to the opinions of examining physician Dr. Schwartz and the reviewing agency physicians. Drs. Crumpler, Soffer, and Schwartz opined about Plaintiff's physical limitations, and Dr. Jones addressed Plaintiff's mental health limitations. The Court will address the ALJ's weighing of the physical and mental health opinion evidence separately.

1.   *The ALJ Improper Weighed the Medical Evidence of Physical Impairments*

a.   Treating Physician Dr. Crumpler

Plaintiff contends that the ALJ erred by discounting treating physician Dr. Crumpler's 2012 opinion that Plaintiff has been limited to less than sedentary work since November 2011. (Dkt. No. 15 at 15-16.) Dr. Crumpler's functional capacity assessment was based in part on her finding that Plaintiff has problems with ambulation and movement despite using a cane. (AR 917.) The ALJ declined to incorporate the majority of Dr. Crumpler's functional capacity recommendations into Plaintiff's RFC, including her opinions that Plaintiff could only sit for two hours, stand and walk for five minutes, rarely lift 10 pounds or more, rarely bend and reach, and never sustain a work routine. (*See* AR 917-918.) Instead, the ALJ accorded Dr. Crumpler's opinion "little weight[,]" stating:

> Dr. Crumpler's opinion is overly restrictive and not supported by the overall evidence of record. For example, treatment notes from Lifelong Medical indicate that when [Plaintiff] was performing regular exercises at home for his back, he was feeling much better [AR 923]. Additionally, his back pain has generally been controlled with medications [AR 988]. On May 15, 2013, [Plaintiff] reported that valium and Tylenol with codeine took his pain to a tolerable level [AR 978]. Dr. Crumpler's opinion is also inconsistent with Dr. Soffer's April 2012 observation of the claimant's ability to walk without a cane and use his right hand to throw the cane into the back seat of the car.

(AR 32.)

This analysis gives sufficiently specific reasons for discounting Dr. Crumpler's opinions about Plaintiff's physical limitations, but those reasons are not supported by substantial evidence in the record. First, the mere statement that Dr. Crumpler's opinion is "overly restrictive and not supported by the overall evidence of record" is not enough. *See Reddick v. Chater*, 158 F.3d

29

715, 725 (9th Cir. 1998); *Valentine*, 574 F.3d at 692.  As the Commissioner notes, the ALJ

rejected Dr. Crumpler's opinion because he regarded it as inconsistent with certain of her

treatment notes.  "A conflict between treatment notes and a treating provider's opinions may

constitute an adequate reason to discredit the opinions of a treating physician or another treating

provider."  *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citations omitted); *see also*

*Molina*, 674 F.3d at 1111-12 (recognizing that a conflict with treatment notes is a germane

reason to reject a treating physician's assistant's opinion); *Valentine*, 574 F.3d at 692-93

(holding that a conflict with treatment notes is a specific and legitimate reason to reject a treating

physician's opinion).  Here, however, substantial evidence does not support the ALJ's

conclusion that Dr. Crumpler's opinion was actually inconsistent with Plaintiff's treatment notes.

Turning to the specific examples of record evidence that, in the ALJ's view, conflict with

Dr. Crumpler's opinion, it is true that the October 2012 treatment note the ALJ relies on

indicated that Plaintiff was "feeling much better" after performing his exercises every day.  (AR

32, 923.)  A single treatment note must be "read in context of the overall diagnostic picture" the

provider draws.  *Ghanim*, 763 F.3d at 1161 (citation omitted); *cf. Lester*, 81 F.3d at 833

("Occasional symptom-free periods . . . are not inconsistent with disability.").  But the treatment

note also states that Plaintiff ran out of his muscle relaxant and was still experiencing back pain.

(*Id.*)  And Dr. Crumpler's notes from November 2011 through June 2013 indicate that Plaintiff's

pain levels fluctuated.  Thus, the treatment note from October 2012 indicating that Plaintiff was

feeling better after performing daily exercises is not sufficient to reject Dr. Crumpler's opinion in

light of other record evidence that his pain remained constant.

The same is true of the ALJ's next reason for rejecting Dr. Crumpler's opinion—that is,

Dr. Crumpler's December 2012 treatment note indicating that Plaintiff had been controlling his

pain through medication.  (AR 32, 988.)  Impairments that are effectively controlled with

medication are not considered disabling under the Social Security Act.  *See* W*arre v. Comm'r of*

*Soc. Sec.,* 439 F.3d 1001, 1006 (9th Cir. 2006) (citation omitted); *see also* Celaya v. Halter, 332

F.3d 1177, 1181 (9th Cir. 2003) (noting that the court properly rejected the plaintiff's pain

complaints were the ALJ cited evidence that plaintiff had been able to control the pain).  But

United States District Court
Northern District of California

1   here, the ALJ's finding that plaintiff's pain is sufficiently controlled by pain medication for him

2   to return to work is not supported by substantial evidence.  To the contrary, the record shows that

3   Plaintiff's responsiveness to pain medications fluctuated significantly during the years that Dr.

4   Crumpler treated him.  For instance, despite feeling better in October 2012 (AR 923), in January

5   and February 2013 Plaintiff reported worsening pain (AR 985-986), and by March 2013 he

6   reported that valium and Tylenol with codeine—the same medications that made his pain

7   "tolerable" a month later—only diminished his pain from 10/10 intensity to 8/10 intensity.  (AR

8   982.)  In *Childress v. Colvin*, No. EDCV 14-0009-MAN, 2015 WL 2380872, at *8 (C.D. Cal.

9   May 18, 2015), the ALJ discounted a medical source opinion on the basis that medication

10  effectively controlled the plaintiff's impairments.  However, treatment notes indicated that the

11  plaintiff continued to experience symptoms of his impairments and physicians repeatedly

12  changed the plaintiff's treatment plan.  *Id.*  The court thus held that the ALJ lacked substantial

13  evidence for discounting the opinion.  *Id.*  Here too, the record shows that Plaintiff consistently

14  reported pain, despite its fluctuating intensity, and physicians prescribed a litany of treatments,

15  including physical and occupational therapy, at-home stretching and exercises, and multiple pain

16  medications.  (*See* AR 890, 922-941.)  Without addressing these other records, the ALJ's

17  conclusion misses the mark.

18          Moreover, the ALJ's reliance on the statement that Plaintiff's pain decreased with

19  medication—at least at the October 2012 appointment—fails to consider how Plaintiff's daily

20  activities, or lack thereof, contributed to his pain relief.  For example, Plaintiff reported lying

21  down for three to four hours between 8:00 a.m. and 5:00 p.m. to ease his pain and to nap.  Even

22  with medication, Plaintiff reported that he "has to continuously change position to remain even

23  somewhat comfortable[,]" which undermines his ability to sustain a work routine, as Dr. Crumpler

24  opined.  (AR 918-919.)  The ALJ did not provide any explanation of how Plaintiff's pain level—

25  even if tolerable on a single day with pain medication—would translate into the ability to return to

26  work given his need to rest much of the day and frequently change positions.  *See* F*air v. Bowen*,

27  885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what

28

31

1  may be the more grueling environment of the workplace, where it might be impossible to

2  periodically rest or take medication.").

3        The ALJ also stated that he was rejecting Dr. Crumpler's opinion because it conflicted

4  with Dr. Soffer's observation that Plaintiff was able to walk to his car without a cane and use his

5  right hand to throw his cane in the back seat.  (*See* AR 32.)  An ALJ may reject the opinion of a

6  treating physician where it conflicts with the report of an examining physician by "setting out a

7  detailed and thorough summary of the facts and conflicting clinical evidence, stating his

8  interpretation thereof and making findings."  *Magallanes*, 881 F.2d at 751 (quotation omitted).

9  An ALJ may also discount the opinion of a treating physician by identifying an examining

10  physician's findings to the contrary and highlighting the evidence that supports that finding.  *See,*

11  *e.g.*, *Creech v. Colvin*, 612 F. App'x 480, 481 (9th Cir. 2015) (citation omitted).  First, the ALJ

12  either mischaracterized or misinterpreted Dr. Soffer's comment about the car incident: whereas the

13  ALJ stated that Dr. Soffer saw Plaintiff "walk independently to his car"—suggesting that he did so

14  without his cane—Dr. Soffer actually noted that Plaintiff walked to his car "holding the cane in his

15  left hand" and "independently got into the driver seat[.]"  (*Compare* AR 32, *with* AR 898.)

16        Moreover, even accepting the ALJ's interpretation, the ALJ has not adequately explained

17  his conclusion that Dr. Soffer's observation undermines Dr. Crumpler's opinion. Notably, Dr.

18  Soffer concluded that Plaintiff had many of the same limitations that Dr. Crumpler advised—*e.g.*,

19  two-hour restrictions on standing and walking, a four-hour limit on sitting, and an inability to

20  work a full eight-hour work shift due to the need to lay down for pain relief and naps.  (*See* AR

21  900.)  Dr. Soffer concluded that Plaintiff needed a cane, like Dr. Crumpler; she merely noted that

22  she "could not exclude the possibility of elaboration" of symptoms based on having observed

23  Plaintiff walk to his car without using his cane and throw it in his back seat using his right arm.

24  (AR 898, 900.)  But that did not change Dr. Soffer's ultimate functional capacity assessment.

25  Thus, the mere observation is not the same as the functional capacity finding that was sufficient to

26  reject the treating physician's opinion in *Creech*.  The ALJ did not identify anything other than

27  that observation as grounds to reject Dr. Crumpler and Dr. Soffer's conclusions about Plaintiff's

28  cane use.  Moreover, it is not clear whether the ALJ meant this conflict to serve as a basis to reject

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Dr. Crumpler's *entire* opinion or only her opinion that Plaintiff required a cane to walk.  In short,

2    Dr. Soffer's post-examination observation does not constitute "substantial evidence" to discount

3    Dr. Crumpler's entire opinion.

4         The Commissioner goes beyond the ALJ's written decision to argue that there are other

5    reasons the ALJ could have rejected Dr. Crumpler's opinion.  (Dkt. No. 17 at 4.)  The

6    Commissioner implies that the ALJ properly rejected Dr. Crumpler's opinion because the opinion

7    of examining physician Dr. Schwartz contradicted it.  (*Id.*)  There is support in case law for such

8    an argument.  *See Creech*, 612 F. App'x at 481; *Ghanim*, 763 F.3d at 1161.  Here, Dr. Schwartz

9    concluded that Plaintiff could perform a range of light work given that Plaintiff had full strength in

10   his upper and lower extremities, full grip strength in both hands and walked with a normal gait,

11   and opined that Plaintiff's cane was only prescribed for long distances and was not medically

12   necessary.  (AR 618-619.)  But the ALJ did not mention Dr. Schwartz's findings as a basis for

13   rejecting Dr. Crumpler's opinions, and it is well established that "[t]he Court cannot consider

14   arguments not cited or relied on by the ALJ."  *Lester v. Astrue*, No. CV 09-7910-JEM, 2010 WL

15   5348610, at *4 (C.D. Cal. Dec. 21, 2010) (citing *Connett*, 340 F.3d at 874); *Bray v. Comm'r of

16   Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of

17   administrative law require us to review the ALJ's decision based on the reasoning and factual

18   findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the

19   adjudicator might have been thinking."); *see also, e.g.*, *Villareal v. Astrue*, No. C 12-02334 LB,

20   2013 WL 5372411, at *14 (N.D. Cal. Sept. 25, 2013) ("The court cannot provide post-hoc

21   rationalizations for the ALJ's decision.") (citation omitted).  The same is true of the

22   Commissioner's contention that the ALJ properly discounted Dr. Crumpler's opinion because it

23   conflicted with the opinions of Drs. Newton and Williams, the agency medical consultants (*see*

24   Dkt. No. 17 at 5): because the ALJ did not include this as a reason for rejecting Dr. Crumpler's

25   opinion, the Court cannot consider such an argument.

26        For each of these reasons, the ALJ did not provide specific and legitimate reasons

27   supported by substantial evidence for rejecting Dr. Crumpler's opinion and therefore erred by

28   giving the opinion reduced weight.

b.      Examining Physician Dr. Soffer

The ALJ also accorded little weight to consultative examining physician Dr. Soffer's

opinion that Plaintiff was limited to less than sedentary work, stating:

> Dr. Soffer's opinion is inconsistent with the actual examination findings and lack of objective signs of a stroke.  Indeed, Dr. Soffer did not have the benefit of reviewing the November 12, 2011 emergency room visit notes indicating that [Plaintiff] did not have a stroke.  Moreover, Dr. Soffer reported that [Plaintiff] may have elaborated his symptoms as [Plaintiff] was observed after the examination walking independently to his car and throwing his cane into the back seat with his right hand.

(AR 32.)

This analysis likewise fails to give sufficiently specific and legitimate reasons substantially

supported by the record for discounting Dr. Soffer's opinions about Plaintiff's physical

limitations.  *See Lester*, 81 F.3d at 830-31 (stating that like "the opinion of a treating doctor, the

opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for

specific and legitimate reasons that are supported by substantial evidence in the record.").  While

the ALJ stated that Dr. Soffer's "actual examination findings" were inconsistent with Dr. Soffer's

opinion, this falls short of "setting out a detailed and thorough summary of the facts and

conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Reddick*,

157 F.3d at 725 (citation omitted).  Put another way, the ALJ never identified what examination

findings were inconsistent with Dr. Soffer's functional capacity opinion.

Perhaps the inconsistency the ALJ found was Dr. Soffer's comment that an unspecified

person observed Plaintiff walking to his car with the cane in his left hand and throwing his cane

into the backseat with his right arm, and therefore that Dr. Soffer could not eliminate the

possibility of some symptom elaboration.  Of course, this is not an affirmative statement that

Plaintiff was exaggerating his symptoms.  But even if it were, an ALJ must do more than merely

"identify conflicting evidence."  *Long v. Colvin*, No. 13-CV-05716-SI, 2015 WL 971198, at *6

(N.D. Cal. Mar. 3, 2015); *see also Orn*, 495 F.3d at 632 (noting that an ALJ must not only identify

the conflicting information, but provide an interpretation explaining the conflict).  Here, the ALJ

did not provide his own interpretation of this evidence or give a specific reason why this evidence

was internally inconsistent.  Indeed, it is unclear why it is not possible for an individual to both be

limited in significant respects, as Dr. Soffer opined that Plaintiff is, and to possibly be

United States District Court
Northern District of California

exaggerating his symptoms to some extent.  Further, while courts have held that a history of exaggerating symptoms is a sufficient reason to discredit claimants' testimony and taint physicians' opinions, *see, e.g.*, *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001); *Romero v. Colvin*, No. 14-CV-02046-MEJ, 2015 WL 3523389, at *12 (N.D. Cal. June 4, 2015), there is no such history here; there is only Dr. Soffer's inability to exclude the possibility that Plaintiff engaged in "[s]ome elaboration[.]"  (AR 900.)  Thus, the ALJ erred in discounting Dr. Soffer's opinion on that basis.

The ALJ also concluded that Dr. Soffer's opinion was inconsistent with Plaintiff's "lack of objective signs of a stroke."  (AR 32.)  But here, too, the ALJ failed to "set[ ] out a detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings." *Reddick*, 157 F.3d at 725.  For instance, the ALJ stated no basis for his conclusion that the lack of objective signs of a stroke is inconsistent with Dr. Soffer's finding that, despite lacking those objective signs, Plaintiff displayed certain stroke-like *symptoms*— specifically, weakness and loss of sensation on the entire right side of his body.  (AR 32, 900.) Even if, as the ALJ concluded, polysubstance abuse and not actual strokes were the root cause of the condition, the ALJ did not explain why that requires discounting Dr. Soffer's observations that Plaintiff experienced discomfort while sitting and had decreased balance, back tenderness, abnormal positioning of his right leg while standing and walking, and limited range of motion, particularly in his right leg, all resulting in exertional limitations.  (AR 32, 898-899.)

Finally, the ALJ noted that Dr. Soffer "did not have the benefit of reviewing the November 14, 2011 emergency room visit notes indicating that the claimant did not have a stroke."  (AR 32.) The extent to which a medical source is "familiar with the other information in [the] case record" is relevant to assessing the weight of that source's medical opinion, but other factors—including the opinion's consistency with the record—are also relevant and may support giving an opinion more weight, even when the medical source has not reviewed all relevant records.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (setting forth factors for the ALJ to consider in assessing the weight of medical opinions.  The ALJ determined that Dr. Soffer's limited review of the record serves as a basis for giving little weight to Dr. Soffer's opinion, but the opinion cannot be disregarded on this basis alone.  *See Boghossian v. Astrue*, No. CV 10-7782-SP, 2011 WL 5520391, at *4 (C.D. Cal.

1   Nov. 14, 2011) (citation omitted).  Especially given that Dr. Soffer's conclusions support Dr.

2   Crumpler's, substantial evidence thus does not support the ALJ's decision in this regard.

3        As with Dr. Crumpler, the Commissioner urges that the ALJ properly rejected Dr. Soffer's

4   opinion because the consultative examiner and state agency physicians' opinions contradicted it.

5   (*See* Dkt. No. 17 at 6.)  The Commissioner also identifies certain medical evidence that further

6   supports the ALJ's conclusion that Dr. Soffer's opinion that Plaintiff had a stroke was wrong, like

7   examining doctors' conclusion that poly-substance abuse had actually caused Plaintiff's stroke-

8   like symptoms.  (*Id.* (citing AR 875).)  But the ALJ did not include these reasons in his

9   explanation, so the Court does not consider them now, *see Bray*, 554 F.3d at 1225; *Connett*, 340

10  F.3d at 874, and for the reasons described above, the reasons the ALJ gave were legally

11  insufficient.  The ALJ therefore erred in rejecting Dr. Soffer's opinion.

12                    c.        Examining Physician Dr. Schwartz

13       Plaintiff also contends that the ALJ erred in assigning the greatest weight to the opinion of

14  state agency consultative examining physician Dr. Schwartz, "who concluded that [Plaintiff] can

15  perform light work."  (AR 32.)  The ALJ found that opinion "most consistent with the overall

16  medical evidence of record, including Dr. Mehta's multiple work status reports indicating that

17  [Plaintiff] can return to work with a restriction of lifting/pushing/pulling up to 25 pounds."  (AR

18  32.)  The ALJ did not provide any other reasons for according this opinion the most weight.

19       Plaintiff contends that the ALJ erred because Dr. Schwartz did not review Plaintiff's 2008

20  lumbar MRI, which showed degenerative disc changes, or Plaintiff's 2011 lumbar MRI, which

21  showed worsened degenerative changes, and thus the ALJ cannot have afforded his opinion the

22  most weight because he was not familiar with the entire record.  (Dkt. No. 15 at 15.)  The extent to

23  which a medical source is "familiar with the other information in [Plaintiff's] case record" is

24  relevant in assessing the weight of that source's medical opinion; however, it is but one factor the

25  ALJ can consider in weighing a medical opinion.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c)

26  (setting forth factors for the ALJ to consider in assessing the weight of medical opinions); *see also*

27  *Boghossian*, 2011 WL 5520391, at *4 (citation omitted).  Thus, the ALJ did not err as a matter of

28

United States District Court
Northern District of California

law by according the most weight to a doctor who did not review the entire record, but the ALJ

should have addressed that Dr. Schwartz did not do so in assessing the weight of his opinion.

Nor has the ALJ provided specific and legitimate reasons supported by substantial

evidence for according Dr. Schwartz's opinion greater weight than that of treating physician Dr.

Crumpler, particularly given that the ALJ did not sufficiently justify discounting Dr. Crumpler's

opinion.  *See Valentine*, 574 F.3d at 692; *Ryan*, 528 F.3d at 1198; *Orn*, 495 F.3d at 632; *Andrews*,

53 F.3d at 1041.  The sole reason the ALJ offered for giving Dr. Schwartz's opinion great weight

was that the opinion was "most consistent with the overall medical evidence of record[.]"  (AR

32.)  As described above, this boilerplate explanation is not enough.  *See Reddick*, 157 F.3d at 725

(citation omitted).  But the ALJ did identify an example of evidence in Plaintiff's medical record:

like Dr. Mehta's work status reports, Dr. Schwartz's opinion indicated that Plaintiff could return to

work with a 25-pound lift/push/pull restriction.[28]  (AR 32.)  Indeed, Dr. Mehta noted that this

lift/push/pull limitation had become a permanent restriction, but that Plaintiff could return to work

with the permanent restriction in place.  (*See* AR 547, 549-551, 555, 573, 579, 583, 590-591, 594.)

While Dr. Mehta's later work status reports from 2009 and 2010 indicate that Plaintiff's pain had

worsened, he did not change the restrictions.  (*See, e.g.*, AR 583-585, 590-594.)  Thus, the ALJ

adequately explained why he accorded the most weight to Dr. Schwartz's lift/push/pull restriction.

But the ALJ's explanation fails to account for other conflicts between Dr. Schwartz and

Dr. Crumpler when it came to other observations about Plaintiff's physical impairments and other

work restrictions.  For example, the ALJ failed to state his interpretation of the dramatic conflict

between examining physician Dr. Schwartz's 2010 opinion that Plaintiff could stand/walk for six

hours in an eight-hour period and sit for the same amount of time and treating physician Drs.

Crumpler and Soffer's opinions that Plaintiff could stand/walk for just two hours in an eight-hour

period and sit for the same amount of time, or Dr. Crumpler's 2012 assessment that Plaintiff could

stand/walk continuously for "maybe 5 minutes[.]"  (AR 619, 900, 917-918.)  Nor did the ALJ

address the conflicts between Dr. Schwartz's opinion that Plaintiff could occasionally stoop and

---

[28] The 25-pound restriction appears to be a typo, as both Drs. Schwartz and Mehta opined that
Plaintiff could return to work with a 20-pound lift/push/pull restriction.  (*See* AR 29-30, 547, 619.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1   crouch with Drs. Crumpler and Soffer's more restrictive limitations of Plaintiff's stooping and

2   crouching capacity.  The ALJ's failure to do so is particularly troubling given that Dr. Schwartz

3   did not review Plaintiff's MRI results, including the 2011 results showing increased degenerative

4   changes in Plaintiff's spine that may well have influenced these restrictions.  Put simply, the ALJ

5   nowhere addresses the remaining findings and restrictions in Dr. Schwartz's opinions that conflict

6   with Dr. Crumpler's, and the Commissioner does not argue otherwise.

7          Thus, while the ALJ might have adequately explained his rationale for assigning the most

8   weight to Dr. Schwartz's opinion about Plaintiff's lifting, pulling, and pushing restrictions over

9   Dr. Crumpler's, he did not offer any basis for accepting Dr. Schwartz's opinion in its entirety over

10  that of the treating physician or the other examining physician.

11          2.      *The ALJ Erred in Weighing the Medical Evidence Regarding Plaintiff's*

12                  *Ability to Maintain Concentration, Persistence, and Pace*

13         Plaintiff argues that the ALJ erred by giving too little weight to the opinion of Plaintiff's

14  treating psychiatrist, Dr. Jones, who treated Plaintiff for about one year prior to completing his

15  functional capacity evaluation, diagnosed Plaintiff with depression and anxiety and concluded that

16  these conditions slightly impaired Plaintiff's activities of daily living and social functioning, and

17  markedly impaired Plaintiff's concentration, persistence, pace, and ability to adapt to work-type

18  settings.  (AR 975-976.)  The ALJ discounted Dr. Jones's opinion about the marked impairments,

19  concluding that they were "not well-supported by his underlying treatment notes, which indicate

20  that [Plaintiff's] symptoms have improved with medications and [he] only had mild symptoms by

21  April 2013."  (AR 33-34.)  The ALJ does not cite particular evidence in the medical record in

22  support of this conclusion, and ordinarily it is not the role of either the Court or the Commissioner

23  to sift through the record to identify the evidence that supports the ALJ's opinion.  *See Bray*, 554

24  F.3d at 1225; *Connett*, 340 F.3d at 874).  But here, there is only one treatment note from Dr. Jones

25  from April 2013, which indicates that by that time Dr. Jones had assigned Plaintiff a GAF score of

26  63—*i.e.*, mild difficulty in functioning, *see supra* n. 27—and noted that Plaintiff had reported that

27  his depression and anxiety symptoms had improved.  (Dkt. No. 17 at 7 (citing AR 980).)  Thus,

28  the Court has no trouble concluding that this is the evidence on which the ALJ relied, and it is

1   proper for the ALJ to reject the opinion of a treating physician by identifying treatment records

2   that conflict with it.

3        While the Commissioner identifies other evidence in the record that further supports the

4   ALJ's conclusion that Dr. Jones's opinion was not well-supported, such that Dr. Jones's treatment

5   notes from earlier in 2013 reflect Plaintiff's own reports that his symptoms were improving

6   through use of medication.  (AR 983, 989, 990.)  Because the ALJ did not specifically identify

7   them and the Court does not consider arguments that the Commissioner raises for the first time,

8   the Court does not consider them.  *See Bray*, 554 F.3d at 1225; *Connett*, 340 F.3d at 874.  So too

9   with the Commissioner's argument that the ALJ properly rejected Dr. Jones's opinion because it

10  conflicted with that of examining psychologist Dr. Torrez.  (*See* Dkt. No. 17 at 7.)  While the ALJ

11  explained why he assigned weight to part of Dr. Torrez's opinion (*see* AR 34), he did not list a

12  conflict between the opinions of Drs. Jones and Torrez as a basis for assigning less weight to the

13  treating physician.  Thus, the ALJ's sole rationale for rejecting Dr. Jones's opinion was the April

14  2013 treatment notes demonstrating some improvement in Plaintiff's mental health symptoms.

15       However, like Dr. Jones, Dr. El-Sokkary concluded that Plaintiff "struggled to maintain a

16  sufficient level of concentration, persistence, and pace, which indicates that he would continue to

17  struggle in a competitive work setting."  (AR 893.)  In Plaintiff's view, this bolsters Dr. Jones's

18  opinion that Plaintiff had marked impairment in concentration, persistence, and pace.  (*See* Dkt.

19  No. 15 at 17.)  The ALJ did not altogether ignore this opinion; it is included in the description of

20  Dr. El-Sokkary's findings, which the ALJ purported to assign the most weight.  (AR 32-33.)

21  Nevertheless, the ALJ concluded that Plaintiff had only moderate difficulties in maintaining

22  concentration, persistence, and pace.  (AR 34.)  The ALJ did not explain whether Dr. El-Sokkary's

23  opinion would result in only moderate impairments or marked limitations, like Dr. Jones.  Thus,

24  while the ALJ may have properly explained why he discounted Dr. Jones's opinion that Plaintiff

25  had marked impairment in concentration, persistence, and pace, the ALJ failed to explain why,

26  despite according Dr. El-Sokkary's opinion great weight, he did not accept Dr. El-Sokkary's

27  conclusion that Plaintiff's impairments in these categories would prevent Plaintiff from working.

28

United States District Court
Northern District of California

The Commissioner's argument to the contrary is unavailing.  The Commissioner contends that the "ALJ considered Dr. El-Sokkary's conclusion, but found the overall record supported a finding that Plaintiff had moderate limitations in concentration, persistence or pace[,]" citing particular evidence that supported the ALJ's conclusion and undermined Dr. El-Sokkary's.  (Dkt. No. 17 at 8.)  For example, the Commissioner notes that Dr. El-Sokkary's conclusion conflicts with that doctor's own observation that Plaintiff recited 6 digits forward and 3 digits backwards; Plaintiff's report that he generally finished tasks that he started and was good at following instructions; and the state agency reviewing physicians' opinions that he had only mild impairments.  (*Id.*)  While the ALJ listed some of this medical evidence in the opinion, he did not explain *how* that evidence conflicted, or not, with Dr. El-Sokkary's opinion about Plaintiff's difficulties maintaining concentration, persistence, and pace.  In effect, the Commissioner once again asks the Court to accept a *post hoc* rationalization of the ALJ's decision.  This the Court cannot do.  And the mere fact that reviewing physicians reached a different conclusion is not enough to discount the opinion of an examining physician like Dr. El-Sokkary.  *See Lester*, 81 F.3d at 831.  Thus, while the ALJ adequately explained why he rejected Dr. Jones's opinion about Plaintiff's marked impairments maintaining concentration, persistence, and pace, he did not sufficiently justify rejecting Dr. El-Sokkary's similar conclusion.

*   *   *

In sum, while the ALJ identified substantial evidence to support his decision to accord the greatest weight to examining physician Dr. Schwartz's opinion about Plaintiff's lifting, pushing, and pulling restrictions, the ALJ erred by failing to identify specific and legitimate reasons supported by substantial evidence to discount the opinion of treating physician Dr. Crumpler and examining physician Dr. Soffer with respect to Plaintiff's other physical limitations.  As for mental health limitations, the ALJ gave specific and legitimate reasons supported by substantial evidence for assigning less weight to Dr. Jones's opinion about Plaintiff's limitations in persistence, concentration, and pace, but failed to explain why he did not credit Dr. El-Sokkary's similar conclusion despite stating that he gave his opinion great weight.  Given that the ALJ's

1    entire decision relied on these opinions as they formed the basis for the RFC that, in turn,

2    underpinned the disability determination, the Court cannot conclude that such error was harmless.

3    **II.      The ALJ's Determination that Plaintiff's Right-Sided Weakness was Non-Severe**

4          A.      Standard for Determining Severity of Impairment

5          The existence of a severe impairment is demonstrated when the evidence establishes that

6    an impairment has more than a minimal effect on an individual's ability to perform basic work

7    activities.  *Webb v. Barnhart*, 433 F.3d 683, 686-87 (9th Cir. 2005) (citing *Smolen*, 80 F.3d at

8    1290).  The regulations define "basic work activities" as "the abilities and aptitudes necessary to

9    do most jobs," which includes physical functions such as walking, standing, sitting, pushing,

10   carrying; capacities for seeing, hearing and speaking; understanding, carrying out, and

11   remembering simple instructions; using judgment; responding appropriately to supervisors, co-

12   workers, and usual work situations; and dealing with changes in a work setting.  20 C.F.R.

13   § 404.1521(b).  This inquiry is "a de minimis screening device to dispose of groundless claims."

14   *Smolen*, 80 F.3d at 1290 (citation omitted).  An impairment is not severe only if it is a slight

15   abnormality with "no more than a minimal effect on an individual's ability to work."  *See* Social

16   Security Ruling ("SSR") 82-28, 1985 WL 56856, at *3 (1985); *Yuckert v. Bowen*, 841 F.2d 303,

17   306 (9th Cir. 1988).  A "finding of no disability at step two" may be affirmed where there is a

18   "total absence of objective evidence of severe medical impairment."  *Webb*, 433 F.3d at 688.

19         B.      The ALJ's Failure to Make a Step Two Finding about Right-Sided Weakness was
20                 Harmless Error

21         Plaintiff contends that substantial evidence does not support the ALJ's determination that

22   Plaintiff's right-sided weakness is not severe and that the ALJ erred by failing to follow the "slight

23   abnormality" standard when determining the severity of Plaintiff's right-sided weakness at step

24   two.  The Commissioner contends that the ALJ properly decided the severity of Plaintiff's

25   impairments and properly considered the medical evidence in reaching that decision.  The

26   Commissioner further asserts that it is immaterial that the ALJ found Plaintiff's right-sided

27   weakness non-severe at step two because Plaintiff was found to have a severe impairment, so the

28   ALJ continued with the disability analysis, which included consideration of all of Plaintiff's

United States District Court
Northern District of California

impairments regardless of severity.  The Court concludes that the ALJ erred in determining that Plaintiff's right-sided weakness was non-severe, but this error was harmless because the ALJ considered Plaintiff's right-sided weakness at later steps in the disability determination.

At step two, the ALJ determined that Plaintiff had several severe impairments, including degenerative disc disease of the lumbar spine, depression, and alcohol abuse.  (AR 24.)  But the ALJ concluded that Plaintiff's alleged stroke was not a medically determinable impairment and therefore not a severe impairment under the Social Security regulations.  (AR 25.)  The ALJ did not separately consider whether "right sided weakness" separately constituted a severe impairment.  (*See* AR 24-25.)  The Commissioner argues that Plaintiff alleged right sided weakness due to stroke, and because the ALJ determined that Plaintiff did not experience a stroke, the inquiry as to right-sided weakness ends there.  (Dkt. No. 17 at 9.)   Not so.  The Commissioner cites Dr. Soffer's neurological evaluation for the proposition that Plaintiff alleged right sided weakness due to stroke.  (AR 896.)  But in his Social Security application, Plaintiff alleged disability due to right-sided weakness, also listed at times as limited use of the right side of his body, *in addition to* stroke.  (AR 87, 125, 329.)  The Commissioner's emphasis on the substantial evidence supporting the ALJ's conclusion that Plaintiff did not experience a stroke is misplaced.

Instead, the ALJ's step two analysis does not consider right-sided weakness as an impairment at all.  (*See*  AR 24-25.)  The Court cannot conclude that substantial evidence supports the ALJ's determination about right-sided weakness when the ALJ failed to make such a determination altogether.  The Commissioner nonetheless argues that substantial evidence was inconsistent with Plaintiff's allegations of severe right-sided weakness, but the record does not reflect a "total absence of objective evidence of severe medical impairment[,]" *Webb*, 433 F.3d at 688, which would be required to make such a finding.  To the contrary, there was sufficient, objective evidence demonstrating that Plaintiff's right-sided weakness had more than a minimal effect on his ability to perform basic work activities.  Plaintiff was hospitalized twice for right-sided weakness (AR 402-403, 413, 846-855), and while it appeared to resolve upon discharge, his complaints of weakness in his right arm and leg continued over the next few years and his primary care physician observed decreased strength and tone on that side (*see, e.g.*, AR 888-890, 939-940).

United States District Court
Northern District of California

1    While in 2010 Plaintiff's gait and strength on the right side appeared normal to an examining

2    physician (AR 617-619), Dr. Soffer observed significant right-sided symptoms during her 2012

3    evaluation (AR 898-900.)  Thus, even though other record evidence suggests only mild right-sided

4    weakness, the Court cannot conclude that Plaintiff failed to meet the "de minimus" screening

5    standard for demonstrating that his right-sided weakness was a severe impairment, especially since

6    the ALJ did not make a finding one way or the other.  The ALJ therefore erred.

7         However, any error was harmless, as the ALJ considered Plaintiff's right-sided weakness

8    in assessing Plaintiff's RFC.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (concluding

9    that "[e]ven assuming that the ALJ erred in neglecting to list the bursitis at Step 2, any error was

10   harmless" because the ALJ discussed the condition later in the analysis and factored it into the

11   plaintiff's RFC); *see, e.g.*, *Smith v. Colvin*, No. 3:14-cv-01210-PA, 2016 WL 680535, at *10 (D.

12   Or. Feb. 19, 2016) ("To establish reversible error at step two, a claimant must show that the ALJ's

13   RFC analysis did not consider the contested step two impairment.  Mere demonstration of error in

14   the ALJ's step two analysis does not establish reversible error.") (citations omitted).  Indeed, here,

15   the ALJ's explanation of his RFC determination described in detail Plaintiff's testimony about the

16   use of his right arm and leg as well as the medical opinions regarding the use of Plaintiff's right

17   limbs and how they affected his balance.  (AR 28, 30-32.)  Moreover, the ALJ acknowledged that

18   Plaintiff alleged disability based on limited use of the right side of his body and expressly included

19   in the RFC that Plaintiff "can occasionally balance and can occasionally finger and handle with

20   the right non-dominant arm."  (AR 27.)  Because the ALJ's RFC determination accounted for

21   Plaintiff's right-sided weakness, the step two error was harmless. *See Lewis*, 498 F.3d at 911.

22   **III.    Scope of Remand**

23        In light of the ALJ's harmful error in weighing the medical evidence, the Court must

24   determine whether to remand this case to the SSA for further proceedings or with instructions to

25   award benefits.  A district court may "revers[e] the decision of the Commissioner of Social

26   Security, with or without remanding the cause for a rehearing," *Treichler v. Comm'r of Soc. Sec.*

27   *Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)) (alteration in original),

28   but "the proper course, except in rare circumstances, is to remand to the agency for additional

United States District Court
Northern District of California

43

investigation or explanation," *id.* (citation omitted).  Ninth Circuit case law "precludes a district court from remanding a case for an award of benefits unless certain prerequisites are met." *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) (citation omitted).  "The district court must first determine that the ALJ made a legal error, such as failing to provide legally sufficient reasons for rejecting evidence." *Id.* (citation omitted).  "If the court finds such an error, it must next review the record as a whole and determine whether it is fully developed, is free from conflicts and ambiguities, and all essential factual issues have been resolved."  *Id.* (internal quotation marks and citation omitted).  In doing so, "the district court must consider whether there are inconsistencies between [the claimant's] testimony and the medical evidence in the record, or whether the government has pointed to evidence in the record that the ALJ overlooked and explained how that evidence casts into serious doubt the claimant's claim to be disabled." *Id.* (internal quotation marks and citation omitted) (alteration in original). "Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits."  *Id.* (citation omitted).

But if the court determines that the record has, in fact, been fully developed and there are no outstanding issues left to be resolved, then it next must consider whether "the ALJ would be required to find the claimant disabled on remand if the improperly discredited evidence were credited as true."  *Id.* (internal quotation marks and citation omitted).  Put another way,

> the district court must consider the testimony or opinion that the ALJ improperly rejected, in the context of the otherwise undisputed record, and determine whether the ALJ would necessarily have to conclude that the claimant were disabled if that testimony or opinion were deemed true. If so, the district court may exercise its discretion to remand the case for an award of benefits.

*Id.* (citation omitted).  Courts are not required to exercise such discretion.  *Id.* (citations omitted); *see also* C*onnett*, 340 F.3d at 874-76.  Instead, they "retain 'flexibility' in determining the appropriate remedy [.]" B*urrell*, 775 F.3d at 1141 (quoting G*arrison*, 759 F.3d at 1021). Specifically, the court "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"  B*urrell*, 775 F.3d at 1141 (quoting G*arrison*, 759 F.3d at 1021).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Applying these principles here, the Court's conclusion that the ALJ erred in rejecting

2   certain treating and examining physicians' opinions without adequate explanation meets the

3   threshold requirement of legal error in failing to provide legally sufficient reasons for rejecting

4   evidence. *See Dominguez*, 808 F.3d at 408.  The next question is whether the record has been

5   fully developed and further administrative proceedings would serve no useful purpose. *Id.*

6   (citation omitted).  Not so here.  The medical record leaves open the question of Plaintiff's exact

7   disability status, as there are inconsistencies among the recommendations of the various

8   physicians and some issues that may lead an ALJ to weigh parts of the opinions more heavily than

9   others.  The Court will therefore remand this case to the ALJ for further proceedings.

10                                            **CONCLUSION**

11    For the reasons described above, the ALJ erred in failing to provide specific, legitimate

12   reasons for discounting the opinions of treating physician Dr. Crumpler and examining physicians

13   Drs. Soffer and Jones.  Accordingly, the Court GRANTS IN PART Plaintiff's Motion for

14   Summary Judgment (Dkt. No. 15) and DENIES Defendant's Cross-Motion for Summary

15   Judgment (Dkt. No. 17).  The Court VACATES the ALJ's final decision and REMANDS for

16   reconsideration consistent with this Order.

17    This Order disposes of Docket Numbers 15 and 17.

18    **IT IS SO ORDERED.**

19   Dated:  June 21, 2016

20

21    _____

22    JACQUELINE SCOTT CORLEY
      United States Magistrate Judge

23

24

25

26

27

28